UNITED STATES v. SHAUVER.

(District Court, E. D. Arkansas, Jonesboro Division. May 25, 1914. On Motion for Rehearing, July 9, 1914.)

1. CONSTITUTIONAL LAW (§ 48*)—STATUTES—VALIDITY.

A federal court will declare an act of Congress unconstitutional only when the question is practically free from real doubt, and the mere fact that the statute goes to the verge of the constitutional power is not enough, but it must appear clearly that it is beyond that power before a court will declare the act void.

[Ed Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. § 48.*]

2. STATES (§ 4*)—POLICE POWER—RESERVED POWERS OF STATES.

The states retain the police power which they, as sovereign nations, possessed prior to the adoption of the national Constitution, so far as such power pertains to the internal affairs of the states.

[Ed. Note.—For other cases, see States, Cent. Dig. § 2; Dec. Dig. § 4.*]

3. UNITED STATES (§ 5*)—POLICE POWER.

The United States possesses power analogous to the police power of the states which every sovereign nation possesses as to its own property, and power to carry into effect powers conferred on it by the Constitution.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 4; Dec. Dig. § 5.*]

4. GAME (§ 3½*)—POWER TO PROTECT MIGRATORY BIRDS—STATUTES—VALIDITY.

Act March 4, 1913, c. 145, 37 Stat. 847, protecting migratory birds and game, cannot be sustained as an exercise of the implied powers of the national government, though it is impossible for any state to enact laws for the protection of migratory wild game, and only the national government can do it with any fair degree of success.

[Ed. Note.—For other cases, see Game, Cent. Dig. § 2; Dec. Dig. § 3½.*]

5. GAME (§ 3½*)—MIGRATORY BIRDS—"PROPERTY OF UNITED STATES."

Migratory birds are not, when on their usual migration, the property of the United States, within Const. art. 4, § 3, subsec. 2, empowering Congress to adopt rules respecting the territory or other property of the United States, but they are the property of the states in their sovereign capacity, as the representatives, and for the benefit of all their people in common, and Act March 4, 1913, c. 145, 37 Stat. 847, protecting migratory birds,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cannot be sustained as an exercise by Congress of the right to adopt regulations for its property.

[Ed. Note.—For other cases, see Game, Cent. Dig. § 2; Dec. Dig. § 3½.* For other definitions, see Words and Phrases, vol. 6, p. 5729.]

6. GAME (§ 3½*)—MIGRATORY BIRDS—PROTECTION.

Act March 4, 1913, c. 145, 37 Stat. 847, protecting migratory birds and game, is invalid because not authorized expressly or by necessary implication by the Constitution.

[Ed. Note.—For other cases, see Game, Cent. Dig. § 2; Dec. Dig. § 3½.*]

On Rehearing.

7. COMMERCE (§ 15*)—INTERSTATE COMMERCE—REGULATION—MIGRATORY BIRDS.

The act cannot be sustained as an exercise by Congress of the power to regulate interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 17, 34, 35; Dec. Dig. § 15.*]

Harvey C. Shauver was indicted for a violation of the migratory birds provision of Act March 4, 1913, c. 145, 37 Stat. 847. Demurrer to indictment sustained.

W. H. Martin, Asst. U. S. Atty., of Hot Springs, Ark., and J. H. Acklen, of Nashville, Tenn., for the United States.

E. L. Westbrooke, of Jonesboro, Ark., for defendant.

TRIEBER, District Judge. The defendant demurs to the indictment in this cause, which charges him with a violation of that part of the Appropriation Act for the Department of Agriculture, approved March 4, 1913 (37 Stat. 828, 847, c. 145), known as the "migratory birds" provision, and the regulations made by the Department of Agriculture in pursuance thereof, and which have been approved by the President. That provision reads:

"All wild geese, wild swans, brant, wild ducks, snipe, plover, woodcock, rail, wild pigeons, and all other migratory game and insectivorous birds which in their northern and southern migrations pass through or do not remain permanently the entire year within the borders of any state or territory, shall hereafter be deemed to be within the custody and protection of the government of the United States, and shall not be destroyed or taken contrary to regulations hereinafter provided therefor. The Department of Agriculture is hereby authorized and directed to adopt suitable regulations to give effect to the previous paragraph by prescribing and fixing closed seasons, having due regard to the zones of temperature, breeding habits, and times and line of migratory flight, thereby enabling the department to select and designate suitable districts for different portions of the country, and it shall be unlawful to shoot or by any device kill or seize and capture migratory birds within the protection of this law during said closed seasons, and any person who shall violate any of the provisions or regulations of this law for the protection of migratory birds shall be guilty of a misdemeanor and shall be fined not more than $100 or imprisoned not more than ninety days, or both, in the discretion of the court. The Department of Agriculture, after the preparation of said regulations, shall cause the same to be made public, and shall allow a period of three months in which said regulations may be examined and considered before final adoption, permitting, when deemed proper, public hearings thereon, and after final adoption shall cause the same to be engrossed and submitted to the President of the United States for approval: Provided, however, that nothing herein contained shall be deemed to affect or interfere with the local laws of the states and territories for the protection of nonmigratory game or

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

other birds resident and breeding within their borders, nor to prevent the states and territories from enacting laws and and regulations to promote and render efficient the regulations of the Department of Agriculture provided under this statute."

In pursuance of this authority the Department of Agriculture has adopted suitable regulations, which have been approved by the President. The only ground of the demurrer is that the act is unconstitutional.

That the national Constitution is an enabling instrument, and therefore Congress possesses only such powers as are expressly or by necessary implication granted by that instrument, is not questioned. Unless, therefore, there is some provision in the national Constitution granting to Congress either expressly or by necessary implication the power to legislate on this subject, the act cannot be sustained.

[1] The deference due from the judiciary to the other co-ordinate departments of the government has made the courts, when the constitutionality of an act of the legislative department is attacked, to yield rather than encroach on the legislative domain. Only if the question is practically free from real doubt will the courts declare an act of the Legislature unconstitutional. The fact that the statute goes to the verge of the constitutional power is not enough; it must appear clearly that it is beyond that power to justify a court to declare it void. These principles are so well settled by an unbroken line of decisions of all the American courts that it is unnecessary to cite authorities to sustain them.

[2] It is equally well settled that as to all internal affairs the states retained their police power, which they, as sovereign nations, possessed prior to the adoption of the national Constitution, and no such powers were granted to the nation. Cooley, Const. Lim. 574; Patterson v. Kentucky, 97 U. S. 501, 503, 24 L. Ed. 1115; Covington, etc., Bridge Co. v. Kentucky, 154 U. S. 204, 210, 14 Sup. Ct. 1087, 38 L. Ed. 962; United States v. Boyer (D. C.) 85 Fed. 425, 434.

[3] But it is now equally well settled that the United States does possess what is analogous to the police power, which every sovereign nation possesses, as to its own property (Camfield v. United States, 167 U. S. 518, 525, 17 Sup. Ct. 864, 42 L. Ed. 260), and to carry into effect those powers which the Constitution has conferred upon it (In re Debs, 158 U. S. 564, 581, 15 Sup. Ct. 900, 39 L. Ed. 1092; Light v. United States, 220 U. S. 523, 536, 31 Sup. Ct. 485, 55 L. Ed. 570; Hoke v. United States, 227 U. S. 308, 323, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. [N. S.] 906, Ann. Cas. 1913E, 905). It is not claimed by counsel for the government that the power to enact such legislation exists under the commerce clause of the Constitution, but it is claimed that subsection 2 of section 3, art. 4, of the Constitution, which is as follows, grants the necessary power:

"The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state."

[4] It is also claimed that it is one of those implied attributes of sovereignty in which the national government has concurrent juris-

diction with the states; that it is a dormant right in the national government; and, where the state is clearly incompetent to save itself, the national government has the right to aid. To sustain the latter proposition stress is laid on the fact that it is impossible for any state to enact laws for the protection of migratory wild game, and only the national government can do it with any fair degree of success; consequently the power must be national and vested in the Congress of the United States. A similar argument was presented to the court in Kansas v. Colorado, 206 U. S. 46, 89, 27 Sup. Ct. 655, 664 (51 L. Ed. 956), but held untenable. Mr. Justice Brewer, speaking for the court, disposed of it by saying:

"But the proposition that there are legislative powers affecting the nation as a whole, which belong to, although not expressed in, the grant of powers, is in direct conflict with the doctrine that this is a government of enumerated powers. That this is such a government clearly appears from the Constitution, independently of the amendment, for otherwise there would be an instrument granting certain specified things made operative to grant other and distinct things. This natural construction of the original body of the Constitution is made absolutely certain by the tenth amendment. This amendment, which was seemingly adopted with prescience of just such a contention as the present, disclosed the wide-spread fear that the national government might, under the pressure of a supposed general welfare, attempt to exercise powers which had not been granted. With equal determination the framers intended that no such assumption should ever find justification in the organic act, and that, if in the future further powers seemed necessary, they should be granted by the people in the manner they had provided for amending that act. * * * Its principal purpose was not the distribution of power between the United States and the states, but a reservation of the people of all powers not granted."

This disposes of that contention.

[5] Are migratory birds, when in a state on their usual migration, the property of the United States or of the states where they are found? If they are the property of the nation, the states would have no power to regulate, control, or prohibit the hunting or killing of them. But the rule of law which all the American courts have recognized is that animals feræ naturæ, denominated as game, are owned by the states, not as proprietors, but in their sovereign capacity as the representatives and for the benefit of all their people in common. This principle has not only been maintained by all the highest courts of the states in which the question has arisen, but has had the approval of the Supreme Court of the United States in every case which has come before it. Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; McCready v. Virginia, 94 U. S. 391, 24 L. Ed. 248; Smith v. Maryland, 18 How. 71, 74, 15 L. Ed. 269; Manchester v. Massachusetts, 139 U. S. 240, 258, 11 Sup. Ct. 559, 35 L. Ed. 159; Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; Geer v Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793; The Abby Dodge, 223 U. S. 166, 32 Sup. Ct. 310, 56 L. Ed. 390.

In McCready v. Virginia, it was said:

"In like manner, the states own the tide waters themselves, and the fish in them, so far as they are capable of ownership while running. For this purpose the state represents its people, and the ownership is that of the people in their united sovereignty."

It is true that this quotation was not absolutely necessary for the determination of the issues in that case, but the question of ownership of the fish in tide water was indirectly involved, and the learned Chief Justice who delivered the opinion of the court evidently deemed it necessary to determine it.

In Manchester v. Massachusetts, a statute of Massachusetts regulating the fishing of menhaden in Buzzard's Bay was involved, and it was there held:

"We think it must be regarded as established that, as between nations, the minimum limit of the territorial jurisdiction of a nation over tide waters is a marine league from its coast; that bays wholly within its territory, not exceeding two marine leagues in width at the mouth, are within this limit; and that included in this territorial jurisdiction is the right of control over fisheries, whether the fish be migratory, free swimming fish, or free moving fish, or fish attached to or imbedded in the soil."

In that case the court also quoted with approval from Dunham v. Lamphere, 3 Gray (Mass.) 268:

"That, in the distribution of powers between the general and state governments, the right to the fisheries and the power to regulate the fisheries on the coasts and in the tide waters of the state were left, by the Constitution of the United States, with the states, subject only to such powers as Congress may justly exercise in the regulation of commerce, foreign and domestic."

In Martin v. Waddell, after a careful review of the English authorities, it was expressly held that:

"The public common of piscary belongs to the people in their united sovereignty, and the state holds it in trust for them."

Geer v. Connecticut may well be considered the leading case on this subject, as it reviews very learnedly all the law pertaining thereto. Mr. Justice White (now Mr. Chief Justice) reviewed, not only the law as it existed under the common law, but, under the laws of Solon, the law as it is found in the Institutes of Justinian, the civil and Salic laws, and the Code Napoléon, and sustained a statute of the state of Connecticut prohibiting the killing of certain game at any time, when intended to be conveyed beyond the limits of the state. After reviewing all the authorities, the learned Justice summarizes the law as follows:

"The foregoing analysis of the principles upon which alone rests the right of an individual to acquire a qualified ownership in game, and the power of the state, deducible therefrom, to control such ownership for the common benefit, clearly demonstrates the validity of the statute of the state of Connecticut here in controversy. The sole consequence of the provision forbidding the transportation of game, killed within the state, beyond the state, is to confine the use of such game to those who own it, the people of that state."

In Silz v. Hesterberg, 211 U. S. 31, 29 Sup. Ct. 10, 53 L. Ed. 75, the constitutionality of a New York statute prohibiting the possession of game at certain times was attacked as violative of the national Constitution. That the state was the owner of all the game in the state, whether migratory or not, was not questioned by those attacking the statute; but it was claimed that the state had no power to prohibit the possession of game in the closed season, when imported from a foreign country or another state, where the killing was not prohibited. The

statute was sustained as a proper exercise of the police power to protect the game in the interest of the food supply of the people of that state.

In The Abby Dodge the principle laid down in the McCready Case that "each state owns the beds of all tide waters within its jurisdiction, unless they have been granted away," also "the tide waters themselves, and the fish in them, so far as they are capable of ownership while running," is reaffirmed.

In Judson on Interstate Commerce, § 11, the author states the law to be:

"Thus the wild game within a state, at common law, belongs to the sovereign, and in this country to the people in their collective capacity, and the state, therefore, has a right to say that it shall not become the subject of commerce."

Even after the game has been reduced to possession there is but a qualified ownership in it, subject to the control of the state. Phelps v. Racey, 60 N. Y. 10, 19 Am. Rep. 140; Commonwealth v. Savage, 155 Mass. 278, 29 N. E. 468; Organ v. State, 56 Ark. 270, 19 S. W. 840; State v. Geer, 61 Conn. 144, 22 Atl. 1012, 13 L. R. A. 804, affirmed in 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793; State v. Northern Pac. Express Co., 58 Minn. 403, 59 N. W. 1100; State v. Rodman, 58 Minn. 393, 59 N. W. 1098; American Express Co. v. People, 133 Ill. 649, 24 N. E. 758, 9 L. R. A. 138, 23 Am. St. Rep. 641; Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129; People v. Collison, 85 Mich. 105, 48 N. W. 292; In re Deininger (C. C.) 108 Fed. 623.

The act of Congress of May 25, 1900 (31 Stat. 187, c. 553 [U. S. Comp. St. 1901, p. 3181]), known as "the Lacey Act," the constitutionality of which has been sustained (Rupart v. United States, 181 Fed. 87, 104 C. C. A. 255), in effect legalizes the statutes of the states for the control of wild game within their borders whether migratory or not (People v. Hesterberg, 184 N. Y. 126, 76 N. E. 1032, 3 L. R. A. [N. S.] 163, 128 Am. St. Rep. 528, 6 Ann. Cas. 353). The claim that the migratory birds are the property of the United States must therefore be held untenable.

[6] It is also argued that Congress has frequently exercised the power to regulate matters which could only have been done under the general police power, and the validity of these acts, when attacked as beyond the power of Congress, has been upheld. Counsel refer to the Lottery Acts, the Anti-Trust Acts, the national railway legislation, the Safety Appliance Act, the Quarantine Laws, the Pure Food and Drug Act, the White Slave Act, the act regulating mailable articles, and other acts of similar nature. But every one of these acts was upheld under some provision of the Constitution, either that of the Post Office Department, the commerce clause, the taxing power, or some other grant. Whenever Congress or the head of a department went beyond that power, as by including intrastate carriage with interstate, the acts were declared unconstitutional. Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550; Illinois Central Ry. Co. v. McKendree, 203 U. S. 514, 27 Sup. Ct. 153, 51 L. Ed. 298; Employers' Liability Cases, 207 U. S. 463,

28 Sup. Ct. 141, 52 L. Ed. 297; Butts v. Merchants' Transp. Co., 230 U. S. 126, 33 Sup. Ct. 964, 57 L. Ed. 1422.

It may be, as contended on behalf of the government, that only by national legislation can migratory wild game and fish be preserved to the people, but that is not a matter for the courts. It is the people who alone can amend the Constitution to grant Congress the power to enact such legislation as they deem necessary. All the courts are authorized to do when the constitutionality of a legislative act is questioned is to determine whether Congress, under the Constitution as it is, possesses the power to enact the legislation in controversy; their power does not extend to the matter of expediency. If Congress has not the power, the duty of the court is to declare the act void. The court is unable to find any provision in the Constitution authorizing Congress, either expressly or by necessary implication, to protect or regulate the shooting of migratory wild game when in a state, and is therefore forced to the conclusion that the act is unconstitutional.

The demurrer to the indictment will be sustained.

### On Motion for Rehearing.

E. Marvin Underwood, Asst. Atty. Gen., and W. C. Herron, both of Washington, D. C., for the United States.

E. L. Westbrooke, of Jonesboro, Ark., for defendant.

TRIEBER, District Judge. The motion for a rehearing is based upon three grounds:

1. It is claimed that, the act having been enacted by Congress and approved by the executive, the court should respect their action, unless it is so plain that they transcended their powers that the duty to declare the act void cannot be avoided.

2. It is claimed that the United States is the owner of all migratory birds when they leave one state and go into another, and as such Congress has the power, under the provisions of subsection 2, section 3, article 4, of the Constitution, to make all needful regulations respecting them.

3. It is claimed that the act is authorized by the commerce clause of the Constitution.

As to the first proposition, the court fully agrees with the learned counsel for the government, and so held in its former opinion.

As to the second proposition, no authorities have been cited to the court which have not been considered by it in its former opinion, and although in full sympathy with all measures tending to preserve the wild game for the benefit of all the people, the court can find no valid reason for changing the conclusions reached at the former hearing.

[7] The last contention was not insisted on at the former hearing, but, on the contrary, it was conceded that the act cannot be sustained under the commerce clause of the Constitution. But it is now argued that:

"A migratory bird, from one state into another, passes from the ownership of the former into that of the latter state. If this be true, a thing recognized by the courts as an article of commerce, when passing between individuals, passes from the ownership of individuals in their collective capacity to other

individuals in their collective capacity, the ownership of the state being merely ownership in trust for their respective citizens."

This same contention was made in Geer v. Connecticut, 161 U. S. 519, 530, 16 Sup. Ct. 600, 605 (40 L. Ed. 793), and was decided adversely. The court there said:

"But the errors which this argument involves are manifest. It presupposes that, where the killing of game and its sale within the state is allowed, it thereby becomes commerce in the legal meaning of that word. In view of the authority of the state to affix conditions to the killing and sale of game, predicated as is this power on the peculiar nature of such property and its common ownership by all the citizens of the state, it may well be doubted whether commerce is created by an authority given by a state to reduce game within its borders to possession, provided such game be not taken, wnen killed, without the jurisdiction of the state. The common ownership imports the right to keep the property, if the sovereign so chooses, always within its jurisdiction for every purpose. * * * Passing, however, as we do, the decision of this question, and granting that the dealing in game killed within the state, under the provision in question, created internal state commerce, it does not follow that such internal commerce became necessarily the subject-matter of interstate commerce, and therefore under the control of the Constitution of the United States."

After quoting from Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, and The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999, it proceeds:

"The fact that internal commerce may be distinct from interstate commerce destroys the whole theory upon which the argument of the plaintiff in error proceeds."

The principle there established has never been questioned nor modified by any later decisions of that court. On the contrary, it has been consistently adhered to. The latest case on that subject is Silz v. Hesterburg, 211 U. S. 31, 41, 29 Sup. Ct. 10, 53 L. Ed. 75, where Geer v. Connecticut, supra, is reaffirmed.

For this court to disregard these decisions of the highest tribunal of the land would be an assumption of authority not only unwarranted, but improper. The Supreme Court is the only tribunal which possesses that power, and it exercises it very sparingly. Fortunately, this question can be reviewed by that court on error, and it is hoped that the government will take proper steps to have it done.

The motion for a rehearing is denied.