UNITED STATES v. McCULLAGH.    SAME v. SAVAGE.    SAME v. SAPP.

(District Court, D. Kansas, First Division.    March 20, 1915.)

Nos. 4196–4198.

1. CONSTITUTIONAL LAW ⊚═48—DETERMINATION OF VALIDITY—PRESUMPTIONS.

An act of Congress must be upheld and enforced, unless its invalidity is made to appear so clearly as to be beyond all question of doubt.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 46; Dec. Dig. ⊚═48.]

2. CONSTITUTIONAL LAW ⊚═27—POWER OF CONGRESS—NECESSITY OF EXPRESS OR IMPLIED CONSTITUTIONAL AUTHORITY.

The federal Constitution is one of purely delegated powers, and when an act of Congress is challenged in due form and proper manner some provision in the Constitution, authorizing the act in express terms or by necessary implication, must be pointed out.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 31; Dec. Dig. ⊚═27.]

3. CONSTITUTIONAL LAW ⊚═38—NECESSITY OF EXPRESS OR IMPLIED CONSTITUTIONAL AUTHORITY.

That an act of Congress not authorized by the powers delegated to Congress by the federal Constitution has a laudable purpose, that the exigencies of the case are great, or that the powers of the states are impotent, will not sustain the act.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 36; Dec. Dig. ⊚═38.]

4. COMMERCE ⊚═15—GAME ⊚═4—UNITED STATES ⊚═5—CONSTITUTIONAL AND STATUTORY PROVISIONS.

Act March 4, 1913, c. 145, 37 Stat. 847 (Comp. St. 1913, § 8837), providing that migratory birds shall be deemed within the custody and protection of the government of the United States, and shall not be destroyed or taken contrary to regulations which the Department of Agriculture is thereby authorized and directed to adopt, is not authorized by the commerce clause of the federal Constitution, as the title to wild animals and birds is in the state, in trust for all the people of the state, and the power of the state is not terminated by the act of the individual in reducing game to his lawful possession, but the state may afterwards so control its disposition as to absolutely prohibit its coming under the protection and control of the commerce clause; nor is such act authorized by article 4, § 3, subsec. 2, providing that Congress shall have power to make all needful regulations respecting the territory or other property belonging to the United States, and that nothing in the Constitution shall prejudice any claims of the United States, or of any particular state, as the federal gov-

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ernment has neither a property right nor a proprietary interest in migratory birds.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 17, 34, 35; Dec. Dig. ☞15; Game, Cent. Dig. § 3; Dec. Dig. ☞4; United States, Cent. Dig. § 4; Dec. Dig. ☞5.]

George L. McCullagh, one Savage, and one Sapp were informed against for an offense. On demurrer to the information. Demurrer sustained.

Fred Robertson, U. S. Atty., of Topeka, Kan., for the United States.
J. H. Harkless, of Kansas City, Mo., for defendant McCullagh.
John F. Philips, of Kansas City, Mo., amicus curiæ.

POLLOCK, District Judge. The information filed against defendant in this case reads as follows:

"Comes now Fred Robertson, United States attorney for the district of Kansas, leave of court having first been obtained and by authority and direction of the Attorney General gives the court to understand and be informed, upon the oath of A. S. Rickner, a federal game warden for the United States Department of Agriculture, that in the county of Cherokee, in the Third division of the district of Kansas and within the jurisdiction of this court, one George L. McCullagh did then and there, on or about the 2d day of April, 1914, unlawfully, knowingly, and willfully shoot and kill forty migratory wild ducks, in violation of the rules and regulations for the protection of migratory birds adopted by the United States Department of Agriculture, and approved by the President of the United States, and promulgated and made public October 1, 1913; said rules and regulations having been made, published, and declared by authority of the act of Congress approved March 4, 1913; and this he, the said George L. McCullagh, did contrary to the form of the statute in such cases made and provided and against the peace and dignity of the United States of America."

It is thus seen the sole offense charged by the information against defendant lies in the fact that he killed wild duck on April 2, 1914, a date falling within the open season for such game as provided by the laws of the state.

The act of Congress on which this prosecution is based is as follows:

"All wild geese, wild swans, brant, wild ducks, snipe, plover, woodcock, rail, wild pigeons, and all other migratory game and insectivorous birds which in their northern and southern migrations pass through or do not remain permanently the entire year within the borders of any state or territory, shall hereafter be deemed to be within the custody and protection of the government of the United States, and shall not be destroyed or taken contrary to regulations hereinafter provided therefor. The Department of Agriculture is hereby authorized and directed to adopt suitable regulations to give effect to the previous paragraph by prescribing and fixing closed seasons, having due regard to the zones of temperature, breeding habits, and times and line of migratory flight, thereby enabling the department to select and designate suitable districts for different portions of the country, and it shall be unlawful to shoot or by any device kill or seize and capture migratory birds within the protection of this law during said closed seasons, and any person who shall violate any of the provisions or regulations of this law for the protection of migratory birds shall be guilty of a misdemeanor and shall be fined not more than one hundred dollars or imprisoned not more than ninety days, or both, in the discretion of the court. The Department of Agriculture, after the preparation of said regulations, shall cause the same to be made public, and shall allow a period of three months in which said regulations may be examined and con-

sidered before final adoption, permitting, when deemed proper public hearings thereon, and after final adoption shall cause the same to be engrossed and submitted to the President of the United States for approval: Provided, however, that nothing herein contained shall be deemed to affect or interfere with the local laws of the states and territories for the protection of non-migratory game or other birds resident and breeding within their borders, nor to prevent the states and territories from enacting laws and regulations to promote and render efficient the regulations of the Department of Agriculture provided under this statute." Act March 4, 1913, c. 145, 37 Stat. 847 (Comp. St. 1913, § 8837).

To this information defendant demurs. The question presented by the demurrer involves alone the constitutional validity of the act.

[1] In ruling this question certain fundamental principles so firmly established in the laws of this country as to become truisms must be borne in mind. As the act assailed on constitutional grounds expresses the deliberate action and intent of a co-ordinate branch of government, it must be either upheld and enforced or its invalidity must be made to appear so clearly as to be beyond all question of doubt.

[2] Our national Constitution is one of purely delegated powers. When the validity of an act asserted to have been passed in pursuance of power thereby conferred on Congress is challenged in due form and proper manner, as in this case, the plaintiff must point to some provision therein found which either in express terms or by necessary implication authorizes and sustains the act. When the government engages her citizens in litigation in her courts, the cause of each is entitled to and must receive at the hands of the court the same fair and just consideration and judgment. It is neither the purpose nor the desire of government that any of her citizens shall in any manner be interfered with in the exercise of any right, except such interference be for the common good and in pursuance of lawful authority.

In the present case the government asserts the power by Congress exercised in the passage of the act challenged is found in either what is commonly called the general welfare clause (subsection 2 of section 3, article 4, of the Constitution), which reads as follows:

"The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular state"

—or to be authorized by the commerce clause, which reads:

"To regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

[3] It is quite evident the thought in the mind of Congress which gave rise to the passage of the act in question, and the common good thereby sought to be accomplished, was the preservation of the migratory bird life of the country from extermination as has in the past been the lot of some species of its wild game, animals, and birds. However, no matter how laudable the purpose of Congress in the passage of the act in question may have been, or how great the ultimate end sought thereby to be attained for the common good, such end does not justify the means employed, if it be found on examination

to lie beyond constitutional bounds. In such event the only proper course lies in amendment of the Constitution.

There can be no doubt but that a uniform system of laws on the subjects of marriage and divorce in this country would terminate many serious evils and accomplish inestimable good. Had Congress the power to so legislate a few comparatively simple provisions would accomplish this much desired result. However, this has been neither done nor attempted by Congress. The same may be said of many subject-matters of legislation under our system of government lodged in the state, but denied to the nation. As, then, the will of Congress to accomplish the much-desired result, without the power of accomplishment, will not suffice, no matter how great the exigencies of the case, or how impotent the powers of the states to protect may be, therefore those provisions of the Constitution relied upon by the plaintiff in this case to confer the power on Congress attempted to be exercised by it in the passage of this act in question must be examined in the light of reason and authority controlling here before a determination of the question presented can be reached.

[4] In so far as the commerce clause is concerned, it does not appear much reliance is placed thereon by the plaintiff in its briefs and argument, and this, no doubt, for the reason contention on this score would seem to have been foreclosed by the Supreme Court in such exhaustive decisions as to leave nothing more to be said on this head, as reference to a few leading cases will show. In the case of Geer v. Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793, it appears the state of Connecticut had enacted a statute for the protection of wild game of that state. Among other provisions the act prohibited, under penalty, the transportation of game out of the state. Geer, a citizen of Massachusetts, went into the state of Connecticut and there had in his possession wild grouse taken in compliance with the privilege to so do accorded by the laws of the state. Having the game so taken in his possession, he was proceeding contrary to the provisions of the act under which it was taken to carry it as his individual personal property out of the state, for which offense he was tried, convicted, and sentenced under the laws of the state. The case was carried to the Supreme Court on the sole ground as the grouse had been lawfully taken in the state of Connecticut, in pursuance of her laws, in face of the commerce clause of the national Constitution, the state of Connecticut was without power to prevent him, as owner of his individual personal property, from carrying it in interstate commerce. In an exhaustive review of this question, as shown by the opinion delivered by Mr. Chief Justice White, certain principles were laid down as the settled law of the land: (1) The wild animal and bird life present in a state is the common heritage of all the people of that state; the title thereto is vested in the state, not in its sovereign capacity, but in trust for all the people of the state. (2) The extent of the personal or individual right which any one may acquire in such game by the act of lawfully taking and reducing to his exclusive possession is not absolute in its nature, as is the like taking and possession of such goods and chattels as grain, fruits, vegetables, domestic animals, etc.,

but constitutes a mere qualified right in the taker to use or dispose of it in such manner as the laws of the state may admit. Hence it was there held Geer had no right under the commerce clause of the national Constitution to carry the grouse out of Connecticut in violation of her laws.

In other words, it is there held the power of the state over game within its territorial limits is not terminated by the act of the individual in reducing it to his exclusive and lawful possession, but, on the contrary, the power of the state follows the game into the hands of the lawful exclusive possessor, and in the assertion of its title held therein in trust for all the people of the state it may so control its use and disposition as to absolutely forbid and prohibit its coming under the protection and control of the commerce clause of the national Constitution. And the reason for the rule is apparent. If the state, either by its laws, or in the absence of prohibitive laws, once permits game to come under authority of the commerce clause of the national Constitution, then all state control or authority thereover of necessity must cease to exist, and its trust title for the common good of all the people of the state be cut off and destroyed.

Hence, by the very force of logic itself, it must follow, if Congress, by the simple fact of the exercise of its claimed legislative power expressed in the act in question, has drawn into national custody and under the protection and control of national laws the migratory wild bird life named in the act, by the same token it has not alone, without the expressed consent of the states, deprived them of the title under which they have heretofore held that portion of such life as comes within their borders in trust for all the people of the state; but, the same being now under the protection of the Constitution and laws of the nation, migratory game birds have become the subject of interstate commerce, and the case of Geer v. Connecticut is no longer applicable thereto.

The power of the states, by their laws in the protection of their trust title for the common good of all the inhabitants of the state, to exclude wild bird and animal life lawfully reduced to the exclusive possession of the individual from the operation of the commerce clause of the national Constitution, as was held in Geer v. Connecticut, supra, has been uniformly maintained by the courts of this country. Martin v. Waddell, 16 Pet. 367, 10 L. Ed. 997; Smith v. Maryland, 18 How. 71, 15 L. Ed. 269; Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559, 35 L. Ed. 159; Lawton v. Steele, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385; The Abby Dodge, 223 U. S. 166, 32 Sup. Ct. 310, 56 L. Ed. 390; United States v. Shauver (D. C.) 214 Fed. 154. It is thus clear no reliance whatever may be placed by the plaintiff on the commerce clause of the Constitution to uphold the act in question.

Does the act find any basis for its support in what is called the general welfare clause of the Constitution above quoted? It is to be noted the purpose of that provision is to guarantee to the federal government the power to dispose of and regulate by law or rule its territorial domains and all other property or property rights held by

it. If, therefore, it may be justly said the general government has either a property right or a proprietary interest in things feræ naturæ, such as the migratory wild game birds here in question, then its power to enact the law in controversy is sustained thereunder; otherwise not.

As has been seen, the basic principle on which the decision of Geer v. Connecticut, supra, rests is that the exclusive title and power to control the taking and ultimate disposition of the wild game of this country resides in the state, to be parted with and exercised by the state for the common good of all the people of the state, as in its wisdom may seem best. Following the decision in that case, there came before the Supreme Court the case of Ward v. Race Horse, 163 U. S. 504, 16 Sup. Ct. 1076, 41 L. Ed. 244, in which the facts, briefly stated, were as follows: Race Horse was a member of the Bannock tribe of Indians living on the Ft. Hale Indian reservation in Idaho. By article 4 of a treaty duly consummated between the United States and his tribe in 1868 (15 Stat. 673) it was provided, as follows:

"The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; *but they shall have the right to hunt upon the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders* of the hunting districts."

By act of Congress thereafter passed a territorial form of government was provided for the territory of Wyoming. Act July 25, 1868, c. 235, 15 Stat. 178. This act provides as follows:

"Nothing in this act shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians."

Wyoming was admitted as a state of the Union in 1890. In July, 1895, the Legislature of that state passed an act regulating the killing of game within the state. Laws 1895, c. 98. Thereafter in October Race Horse killed elk in Uinta county in that state on public lands of the United States, as he was authorized to do under the treaty made between the United States and his tribe, but in violation of the act of the Legislature of the state of Wyoming. Being prosecuted under the laws of the state, he justified his conduct under the provision of the treaty with his tribe above quoted. He was convicted and sentenced under the state law. His application for discharge on a writ of habeas corpus being denied him, he appealed to the Supreme Court. Both the state law and the treaty being in full force at the time he killed the elk, the question presented was which should yield, the law of the state or the treaty of the government with his tribe, made by virtue of express authority of the national Constitution? Mr. Chief Justice White, delivering the opinion of the court, said:

"The power of a state to control and regulate the taking of game cannot be questioned. Geer v. Connecticut, 161 U. S. 519 [16 Sup. Ct. 600, 40 L. Ed. 793]. * * * The argument, now advanced, in favor of the continued existence of the right to hunt over the land mentioned in the treaty, after it had become subject to state authority, admits that the privilege would cease

by the mere fact that the United States disposed of its title to any of the land, although such disposition, when made to an individual, would give him no authority over game, and yet that the privilege continued when the United States had called into being a sovereign state, a necessary incident of whose authority was the complete power to regulate the killing of game within its borders. This argument indicates at once the conflict between the right to hunt in the unoccupied lands, within the hunting districts, and the assertion of the power to continue the exercise of the privilege in question in the state of Wyoming in defiance of its laws. * * * The power of all the states to regulate the killing of game within their borders will not be gainsaid; yet, if the treaty applies to the unoccupied land of the United States in the state of Wyoming, that state would be bereft of such power, since every isolated piece of land belonging to the United States as a private owner, so long as it continued to be unoccupied land, would be exempt in this regard from the authority of the state."

It was there held the simple fact of the admission of Wyoming into the Union as a state, possessing like and equal unrestricted control over the wild animal life within her borders, authorized the Legislature of the state, in the exercise of such plenary power of control, to prohibit and make criminal the doing of an act guaranteed by solemn treaty of the government to Race Horse as a member of his tribe.

To the fact that the title and exclusive power of control over wild game coming within the borders of a state of this country resides in the state, and not in the nation, the following cases bear indisputable proof: Geer v. Connecticut, supra; Ward v. Race Horse, supra; Phelps v. Racey, 60 N. Y. 10, 19 Am. Rep. 140; In re Deininger (C. C.) 108 Fed. 623; The Abby Dodge, supra; Commonwealth v. Savage, 155 Mass. 278, 29 N. E. 468; Organ v. State, 56 Ark. 270, 19 S. W. 840; State v. Geer, 61 Conn. 144, 22 Atl. 1012, 13 L. R. A. 804; State v. Northern Pacific Express, 58 Minn. 403, 59 N. W. 1100; State v. Rodman, 58 Minn. 393, 59 N. W. 1098; American Express Co. v. People, 133 Ill. 649, 24 N. E. 758, 9 L. R. A. 138, 23 Am. St. Rep. 641; Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129; People v. Collison, 85 Mich. 105, 48 N. W. 292; State v. Heger, 194 Mo. 707, 93 S. W. 252; State ex rel. v. Warner, 197 Mo. 650, 94 S. W. 962; State v. Weber, 205 Mo. 36, 102 S. W. 955, 10 L. R. A. (N. S.) 1155, 120 Am. St. Rep. 715, 12 Ann. Cas. 382; State v. Repp, 104 Iowa, 305, 73 N. W. 829, 40 L. R. A. 687, 65 Am. St. Rep. 463; Behring Sea Arbitrators' Decisions, 32 Am. Law Reg. 901.

The precise question here involved was presented to and considered by the District Court of the United States for the Eastern District of the State of Arkansas in the case of United States v. Shauver, 214 Fed. 154, in which case Judge Treiber, in an able and exhaustive opinion, arrived at the same conclusion here reached.

The act challenged is believed to be the single instance in the entire legislative or judicial history of this nation, or the composing states, in which a contrary view has been expressed. Unless a departure, as radical in theory as it is important in its effects, is to be made from fundamental principles long established by our laws, and long acquiesced in by our people, the act in question must be held incapable of support by any provision of the organic law of our country. If the act in question shall, on any ground, or for any reason, be upheld and enforced, it must surely follow the many laws of the separate states

of this Union must hereafter be held inoperative, for there can be no divided authority of the nation and the several states over the single subject-matter in issue, with either safety to the nation or security to the citizen. And this for the reason, although a power of control be delegated by the Constitution to the national government, still such power may be exercised by the states until Congress acts. But so soon as Congress, in pursuance of its delegated power, occupies the field, all state laws become automatically suspended and inoperative. Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; Ogden v. Saunders, 12 Wheat. 213, 6 L. Ed. 606; Boyle v. Zacharie, 6 Pet. 348, 8 L. Ed. 423; Cook v. Moffatt et al., 5 How. 295, 12 L. Ed. 159; Bank of Tennessee, etc., v. Horn, 17 How. 157, 15 L. Ed. 70; Baldwin v. Hale, 1 Wall. 223, 17 L. Ed. 531; Baldwin v. Bank of Newbury, 1 Wall. 234, 17 L. Ed. 534; Gilman v. Lockwood, 4 Wall. 409, 18 L. Ed. 432; Crapo v. Kelly, 16 Wall. 610, 21 L. Ed. 430; Sherlock et al. v. Alling, Administrator, 93 U. S. 99, 23 L. Ed. 819; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508; Nashville, etc., Railway v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352; Cole v. Cunningham, 133 U. S. 107, 10 Sup. Ct. 269, 33 L. Ed. 538; Geilinger v. Phillipi, 133 U. S. 246, 10 Sup. Ct. 266, 33 L. Ed. 614; Brown v. Smart, 145 U. S. 454, 12 Sup. Ct. 958, 36 L. Ed. 773; Butler v. Goreley, 146 U. S. 303, 13 Sup. Ct. 84, 36 L. Ed. 981; Gulf, Colorado, etc., Railway v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108; Southern Ry. Co. v. Reid, 222 U. S. 424, 32 Sup. Ct. 140, 56 L. Ed. 257; Nor. Pac. Ry. v. Washington, 222 U. S. 370, 32 Sup. Ct. 160, 56 L. Ed. 237; Second Employers' Liability Cases, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.

In Smith v. Alabama, supra, Mr. Justice Matthews, delivering the opinion of the court, said:

"The grant of power to Congress in the Constitution to regulate commerce with foreign nations and among the several states, it is conceded, is paramount over all legislative powers which, in consequence of not having been granted to Congress, are reserved to the states. It follows that any legislation of a state, although in pursuance of an acknowledged power reserved to it, which conflicts with the actual exercise of the power of Congress over the subject of commerce, must give way before the supremacy of the national authority."

In Second Employers' Liability Cases, supra, Mr. Justice Van Devanter, delivering the opinion of the court, said:

"True, prior to the present act the laws of the several states were regarded as determinative of the liability of employers engaged in interstate commerce for injuries received by their employés while engaged in such commerce. But that was because Congress, although empowered to regulate that subject, had not acted thereon, and because the subject is one which falls within the police power of the states in the absence of action by Congress."

Not only is this true, but the argument of necessity, so strongly urged on the part of the government at the hearing, to preserve the migratory bird life of the country from extinction, would seem to the thoughtful mind more fanciful than real, and for this reason: The

several states, as has been seen, possess the most absolute and plenary power of control over the subject-matter of wild animal and wild bird life within their territorial domains it is possible to either conceive or to grant. In the exercise of this unlimited power the states acting together may beyond all question prohibit absolutely and unconditionally the taking of any such wild life in any part of this country, either temporarily or for all time. Hence, it turns out, the argument of necessity for action on the part of the government arises, not so much from any want of power to control on the part of the several states as from dissatisfaction as to the manner in which such plenary power possessed by the several states is exercised. It is quite obvious differences of opinon and difficulties of the nature involved are inherent in the very form and structure of this government, subject to change or correction, however, only in the manner prescribed by its founders.

It follows the demurrer to the information must be sustained. It is so ordered.

The same order will enter in cases No. 4196, United States v. Savage, and in No. 4198, United States v. Sapp, which cases were submitted with that under consideration.