UNITED STATES of America, Plaintiff,

v.

Sheldon C. G. HELSEY, Orville B. Jones and Jerry A. Shipman, Defendants.

No. CR–78–91–BLG.

United States District Court,
D. Montana,
Billings Division.

Jan. 11, 1979.

Robert L. Zimmerman, Asst. U. S. Atty., Billings, Mont., for plaintiff.

Willis B. Jones, Blair Jones, Jones Law Firm, Billings, Mont., for defendants.

### ORDER

BATTIN, Chief Judge.

The defendants in this case have been charged by information with violation of the Airborne Hunting Act of 1971, 16 U.S.C. § 742j–1, and with trespass on Indi-

an trust land for the purpose of hunting thereon, in violation of 18 U.S.C. §§ 1165 and 2. The defendants have moved to dismiss Count Two of the information, which charges them with violation of the Airborne Hunting Act, and to suppress certain evidence acquired and certain statements taken by Bureau of Indian Affairs Criminal Investigator Trottier, and Crow Tribal law enforcement personnel. The defendants have also moved to compel production by the government of a witness list.

### I. *Motion to Dismiss*

The defendants, in moving to dismiss Count Two of the information, contend that the Airborne Hunting Act, 16 U.S.C. § 742j–1, which is a prohibition of airborne hunting, is unconstitutional. It is the defendants' contention in this regard that by virtue of the reserved powers doctrine of the Tenth Amendment, and by virtue of the absence of any express grant of authority to Congress by the Constitution to enter the arena of game and fish management within the states, § 742j–1 constitutes an unlawful preemption of reserved state regulatory authority. The United States has advanced the argument that the statute in question is authorized by Article I, Section 8, Clause 1, of the Constitution, the General Welfare Clause. Because such legislation as § 742j–1 is constitutionally authorized, it is the further contention of the United States that, although the states have, by virtue of their police power, the initial authority to regulate the taking of fish and game, the federal government is empowered to totally displace state regulation in this area.

Article I, Section 8, Clause 1, of the United States Constitution provides that "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; . . . ." It is an inarguable proposition that the General Welfare Clause constitutes a grant of expansive power to the Congress. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). However, it is equally inarguable that

. . . the phrase "to provide for the general welfare" qualifies the power "to lay and collect taxes." The view that the clause grants power to provide for the general welfare, independently of the taxing power, has never been authoritatively accepted.

*United States v. Butler,* 297 U.S. 1, 64, 56 S.Ct. 312, 318, 80 L.Ed. 477 (1936).

In the *Butler* decision the Court further stated, quoting from *Linder v. United States,* 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925), that

"Congress cannot, under the pretext of executing delegated power, pass laws for the accomplishment of objects not entrusted to the Federal Government. And we accept as established doctrine that any provision of an act of Congress ostensibly enacted under power granted by the Constitution, not naturally and reasonably adapted to the effective exercise of such power but solely to the achievement of something plainly within the power reserved to the States, is invalid and cannot be enforced."

*Butler,* 297 U.S. at 69, 56 S.Ct. at 320.

Analysis of the authorities and of the underlying legislative history has persuaded me that § 742j–1 constitutes an impermissible and invalid preemption of a regulatory power plainly reserved to the states and, as such, cannot be enforced.

The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The reserved powers doctrine of the Tenth Amendment has long been fundamental to varied aspects of American decisional law. In *Hammer v. Dagenhart,* 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), the Court, while recognizing federal jurisdiction over interstate commerce, emphasized preservation of powers carefully reserved to the states by the Tenth Amendment.

The maintenance of the authority of the states over matters purely local is as essential to the preservation of our institutions as is the conservation of the su-

premacy of the Federal power in all matters intrusted to the nation by the Federal Constitution.

In interpreting the Constitution it must never be forgotten that the nation is made up of states, to which are Intrusted the powers of local government. And to them and to the people the powers, not expressly delegated to the national government are reserved. [Citation omitted.] The power of the states to regulate their purely internal affairs by such laws as seem wise to the local authority is inherent and has never been surrendered to the general government.

*Hammer v. Dagenhart,* 247 U.S. at 275, 38 S.Ct. at 532.

As it is apparent that the states have reserved those powers not expressly granted to the federal government by the Constitution, and that Congress is powerless to constitutionally preempt such reserved powers, the next inquiry is whether the regulation of fish and wildlife is a power reserved to the states. The general rule controlling this inquiry is found in *Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), in which it is determined that the right to control and regulate fish and wildlife is reserved to the states. The justification for the rule is founded upon two distinct philosophies. The first is that wild game within a state is held in trust by the state for the people in their collective sovereign capacity; second, that the inherent police power of the states enables them to exclusively regulate fish and game within their borders. *Geer,* 161 U.S. at 528, 534, 16 S.Ct. 600. In *United States v. McCullagh,* 221 F. 288 (D.Kansas 1915), Judge Pollock, relying heavily on *Geer,* declared unconstitutional an Act of Congress which had as its purpose federal protection of migratory waterfowl. In so holding, the Court stated that:

If the state, either by its laws, or in the absence of prohibitive laws, once permits game to come under authority of the . . . national Constitution, then all state control or authority thereover of necessity must cease to exist, and its

trust title for the common good of all the people of the state be cut off and destroyed.

*United States v. McCullagh*, 221 F. at 292.

The Court further stated that

.  .  .  title and exclusive power of control over wild game coming within the borders of a state of this country resides in the state, and not in the nation .  .  .

*McCullagh*, 221 F. at 294.

In order to preclude misunderstanding, it must be made clear that a federal migratory bird Act, the Migratory Bird Treaty Act, 16 U.S.C. §§ 703, *et seq.*, is presently in force and has been upheld by the United States Supreme Court in *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). *Holland* is distinguishable from *McCullagh* insofar as the Congressional power for enactment of the Migratory Bird Treaty Act was derived expressly from the power of the federal government to enter into treaties with other sovereign nations and to make regulations reasonably necessary to the implementation of such treaties. The facts in *Holland* show that the United States entered into a treaty with Great Britain for the protection of migratory waterfowl. The Court upheld the Act as being passed by Congress pursuant to the treaty power, but made clear that it was not addressing the validity of previous decisions concerning federal regulation of fish and wildlife.

An earlier act of Congress that attempted by itself, and not in pursuance of a treaty, to regulate the killing of migratory birds within the states had been held bad in the district court. *United States v. Shauver*, [D.C.], 214 F. 154; *United States v. McCullagh*, [D.C.], 221 F. 288. Those decisions were supported by arguments that migratory birds were owned by the states in their sovereign capacity, for the benefit of their people, and that under cases like *Geer v. Connecticut*, [citations omitted], this control was one that Congress had no power to displace. The same argument is supposed to apply now with equal force.

Whether the two cases cited were decided rightly or not, they cannot be accepted as a test of the treaty power.

*Missouri v. Holland*, 252 U.S. at 432, 433, 40 S.Ct. at 383.

It clearly appears that the Court went to great length in response to the rationale of *Shauver* and *McCullagh* to distinguish the *Holland* case by justifying the Migratory Bird Treaty Act pursuant to Congress' treaty power, and on no other grounds.

This Court, too, has found, on at least two occasions, that the regulatory power over fish and wildlife is properly vested in the states.

In two analogous situations, involving a conflict between state and tribal jurisdiction, this Court held that the State of Montana's police power provided it with wildlife regulatory authority over the non-trust lands of the Crow Indian Reservation. In *United States v. Sanford*, 547 F.2d 1085 (9th Cir. 1976), in considering the applicability of Montana game laws to non-Indians on Indian reservations, the Court of Appeals affirmed this Court's finding that the State of Montana has authority to regulate hunting and fishing by non-Indians on the Crow Reservation. In reaching this decision, the Court of Appeals cited with approval a statement appearing in a Montana case, *State v. Danielson*, 149 Mont. 438, 427 P.2d 689 (1967):

[T]he State of Montana has jurisdiction to enforce its fish and game regulations on Indian reservations contained within its boundaries with respect to persons who are not tribal Indians unless precluded from doing so by an act of Congress or unless such enforcement would interfere with self-government on the reservation.

*United States v. Sanford*, 547 F.2d at 1089.

A paramount consideration in the *Sanford* case is the finding that 18 U.S.C. § 1165, the trespass statute which defendants in that case were charged with violating, does not represent an attempt by the federal government to enter the arena of fish and game regulation on the Crow Indian Reservation

or on any other Indian reservation. After making this observation, the Circuit noted:

> Further, we are convinced that the application of Montana game laws to the activities of non-Indians on Indian reservations does not interfere with tribal self-government on reservations. We express no opinion concerning the possible concurrent application of tribal law to non-Indians on Indian reservations under the circumstances of this case.

*United States v. Sanford,* 547 F.2d at 1089.

In *United States et al. v. State of Montana et al.,* 457 F.Supp. 599 (D.Mont.1978), this Court found that title to the bed and banks of the Big Horn River was quieted in the State of Montana, and found further that the State of Montana has exclusive jurisdiction to regulate non-Indian hunting and fishing activities on the Big Horn River and on all patented land owned by non-Indians within the exterior boundaries of the Crow Indian Reservation. This Court also ruled that the State of Montana has concurrent jurisdiction with the United States to regulate non-Indian hunting and fishing activities on tribal or Indian lands if such activities are in violation of state law. The concurrent jurisdiction of the United States to so regulate non-Indian activities was found to be predicated upon 18 U.S.C. § 1165. In so holding, this Court stated that:

> [T]he State is enfranchised to exercise its regulatory power over non-Indians on the Crow Reservation as an extension of its police powers over all land within its borders, regardless of title [citation omitted]. The State's statutory and regulatory scheme does not limit what the Tribe may prohibit with respect to hunting and fishing on tribal lands; it merely provides the conduit for enforcing the State's police power within its territory where non-Indians are involved.

*United States v. State of Montana et al.,* 457 F.Supp. 599 (D.Mont.1978).

It is evident upon a reading of its text that § 742j–1 is a statute regulating the taking of fish and wildlife.

The Congress further declares that the provisions of sections 742a to 742d and 742e to 742j of this title are necessary in order to accomplish the objective of proper resource development, . . . with the intent of maintaining and increasing the public opportunities for recreational use of our fish and wildlife resources . . . . .

16 U.S.C. § 742a.

Such federal wildlife regulations can be sustained only if enacted pursuant to a constitutional grant of Congressional authority. This Court is aware of no such grant of authority, and has been cited none.

It is uncontested that all 50 states have enacted regulations governing airborne hunting. The Montana statute governing airborne hunting is found in R.C.M. (1947) § 26–301. That statute states, in pertinent part, that:

> (2)(a) No game birds or game or fur-bearing animals may be killed, taken, or shot at from any aircraft including helicopters; nor may any aircraft or helicopter be used for the purpose of concentrating, pursuing, driving, rallying, or stirring up any game or migratory birds or game or fur-bearing animals; . . . . .

As § 742j–1 has been enacted absent an express grant of constitutional authority, permitting it to stand operates to preempt the above-cited State fish and wildlife regulation. Such a result cannot pass the constitutional muster demanded by the Tenth Amendment. Indeed, a review of the legislative history of § 742j–1 reveals that the statute was deemed to be of dubious constitutionality prior to its enactment. Several reports submitted to Senator Magnuson of the Senate Committee considering the Airborne Hunting Act are of particular importance.

The Department of Justice, through Deputy Attorney General Richard G. Kleindienst, informed the Senate Committee that it was the Department's view that the Airborne Hunting Act was of doubtful constitutionality and that the Department was unaware of any precedent for a conservation measure of its breadth. The recom-

mendation of the Department of Justice was against enactment of the Act in question. 2 U.S.Code, Cong. & Admin.News, pp. 1735, 1743 (1971).

The Department of the Interior, through Hollis M. Dole Assistant Secretary of the Interior, recommended against enactment of the Act in question for the reason that the objective of the Act could best be attained, and the question of jurisdiction most easily resolved, by enactment of uniform state laws. 2 U.S.Code, Cong. & Admin. News, p. 1741 (1971).

The Department of Agriculture, through Acting Secretary J. Phil Campbell, recommended against the enactment of § 742j–1 for the reason that the Department had long held the view that the states have the general responsibility to regulate, protect, and control fish and wildlife. It is the opinion of this Court that § 742j–1 is an invalid preemption of state regulatory authority, violative of the Tenth Amendment.

In holding that § 742j–1 constitutes an invalid exercise of power by Congress, in violation of the states' reserved power to regulate fish and wildlife, this Court is fully cognizant of the holding in *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). *Kleppe* greatly expanded Congressional power to enact statutes regulating fish and wildlife on federal lands under the grant of authority embodied in the Property Clause, Article I, Section 8, Clause 17, of the Constitution. In that case, the Court ruled that Congress can protect wildlife on land owned by the United States as an incident of ownership, notwithstanding state law to the contrary. *Kleppe* is inapplicable here, insofar as the statute here in issue, § 742j–1, makes no differentiation between state, private, federal, or Indian trust lands. The statute is simply a national hunting regulation, applicable to all land, and as such is unconstitutionally overbroad.

From the foregoing it is the Court's conclusion that defendants' motion to dismiss Count Two of the information is well taken.

II. *Motions to Suppress*

The defendants have also filed two motions to suppress; one is directed toward the suppression of certain statements made by the defendants prior to the time the defendants were advised of their *Miranda* rights, and the other is directed toward suppression of all evidence obtained during the detention of the defendants by Robert Kelly and BIA Criminal Investigator Roy Trottier. As the motions are brought on substantially the same grounds, and arise out of the same facts, I shall consider them jointly.

In considering defendants' motions, I am constrained to reflect upon the law enforcement procedure utilized in this case, and the vast degree by which it missed the mark of acceptable and appropriate procedure. Indeed, the procedure followed in this case has been perhaps the most egregiously violative of defendants' rights of any upon which I have ruled.

Testimony at the hearing on defendants' motions revealed that defendants' airplane and pickup were first spotted by Robert Kelly in an overflight instituted for the express purpose of locating vehicles, the description of which matched those in defendants' possession, which had reportedly been involved in aerial hunting. Kelly landed his small plane, approached defendants' plane, which was unoccupied, and removed the keys, registration, and two shotguns from inside. Kelly then returned to his plane, took off, and circled the area, awaiting the arrival of other law enforcement personnel. Upon the arrival of Roy Trottier, Criminal Investigator for the BIA, Kelly landed once again. Trottier, who was in charge of the investigation at the scene, began questioning the defendants. There can be no question but that the defendants were, at the time of Kelly's first sighting their vehicles, suspects in the case. Similarly, there can be no question but that the defendants were, although never arrested, detained by Trottier and the others. In view of the fact that Kelly at all times retained the keys to defendants' airplane, and of the testimony of defendant Jones

that he considered himself to be in custody, it is evident that these defendants were effectively foreclosed from leaving the scene until such time as the law enforcement personnel present permitted them to do so.

The questioning of defendants continued for approximately two hours after Trottier arrived. At no time during this questioning were defendants advised of their *Miranda* rights. Finally, after some two hours, during which time Trottier had the defendants remove articles from their airplane and pickup for photographing, and further, had them replace the shotguns in the airplane for photographing, Trottier determined that the defendants should be advised of their rights. He handed each defendant a waiver of rights form, which enumerated the defendants' *Miranda* rights, and had each defendant sign it. Subsequently, defendants refused to answer Trottier's questions.

■ It is this Court's view that the actions of the law enforcement personnel in this case cannot be justified under any criminal procedural doctrine. The statements sought by the defendants to be suppressed were obtained under such circumstances as suggest a total abridgement of defendants' Fifth Amendment rights. Similarly, the photographs, and other evidence obtained at the scene, were obtained in such a manner as to suggest not only an abridgement of defendants' Fourth Amendment rights, but even an effort on the part of law enforcement officers to manufacture inculpatory evidence. It is this Court's finding that such evidence, being improperly obtained, is properly suppressed. Therefore,

IT IS ORDERED that defendants' motion to dismiss Count Two of the information against them be, and the same hereby is, granted, on the grounds that 16 U.S.C. § 742j–1 is unconstitutional.

IT IS FURTHER ORDERED that defendants' motion to suppress certain statements made by them prior to being advised of their *Miranda* rights be, and the same hereby is, granted.

IT IS FURTHER ORDERED that defendants' motion to suppress all photographic evidence as well as any items taken from the defendants' airplane and pickup, as being obtained in violation of defendants' Fourth Amendment rights be, and the same hereby is, granted.

■ IT IS FURTHER ORDERED that defendants' motion to compel production by the United States of its witness list be, and the same hereby is, denied.