**UNITED STATES v. 2,271.29 ACRES, MORE OR LESS, OF LAND IN LA CROSSE, TREMPELEAU, VERNON, AND GRANT COUNTIES, WIS., et al.**

District Court, W. D. Wisconsin. November 15, 1928.

No. 190.

Stanley M. Ryan, of Janesville, Wis., and John A. Murphy, Sp. Asst. U. S. Atty., of Winona, Minn., for the United States.

John W. Reynolds, Atty. Gen., and Michael J. Dunn, Asst. Atty. Gen., for the State of Wisconsin.

LUSE, District Judge. Proceedings to condemn certain lands in Grant, La Crosse, Trempeleau, and Vernon counties, Wisconsin, for the "Upper Mississippi Wild Life and Fish Refuge," provided for by the Act of Congress of June 7, 1924 (43 Stat. at Large, 650 [16 USCA §§ 721–731]). The Attorney General for the state of Wisconsin moves to dismiss: (1) Because the petition does not state facts warranting the relief sought; and (2) this court lacks jurisdiction.

While proceedings for the exercise of eminent domain are considered law actions (Strong, J., in Kohl v. U. S., 91 U. S. 367, 23 L. Ed. 449; Franzen v. Ry. Co. (C. C. A.) 278 F. 371), no objection is made to the method of raising the points made by the state, and its motion will therefore be deemed a demurrer and treated as such.

The second ground of demurrer may be disposed of with little discussion. The contention of respondent the state of Wisconsin is that the petition misjoins two causes of action: One to condemn lands, which is conceded to be within this court's jurisdiction; the other, because of the prayer for an order permitting persons having conflicting claims to the land to file appropriate pleadings asserting such claims and to pursue the funds paid into court, and have their rights in the funds determined, without further concern to the United States, the proceedings are in the nature of proceedings to quiet title, and, as conflicting claims may arise between claimants having no diversity of citizenship, this court has no jurisdiction. The contention involves several propositions, but all are met by the proposition that the court has undoubted jurisdiction of the condemnation proceedings and to receive the funds awarded for lands into its registry, and as an incident thereof to determine which, of

adverse claimants, such funds should be paid to, regardless of diversity of citizenship, or the amount in controversy, between such claimants. True, as was held in United States v. Eisenbeis (C. C. A.) 112 F. 190, under certain circumstances, such jurisdiction would not be deemed exclusive of that of state courts, but concurrent therewith; but that presents no valid reason, as I see it, why this court has not complete jurisdiction of the matter. The second ground of demurrer will be overruled.

The first ground of demurrer requires more extended discussion. The second, third, and fourth sections of the Act of June 7, 1924, read as follows:

"Sec. 2. The Secretary of Agriculture is authorized and directed to acquire by purchase, gift, or lease, such areas of land, or of land and water, situated between Rock Island, Illinois, and Wabasha, Minnesota, on either side of or upon islands in the Mississippi River which are subject to overflow by such river and which are not used for agricultural purposes, as he determines suitable for the purposes of this act.

"Sec. 3. Any such area, when acquired in accordance with the provisions of this act, shall become a part of the Upper Mississippi River Wild Life and Fish Refuge (hereinafter in this act referred to as the 'refuge'). The refuge shall be established and maintained (a) as a refuge and breeding place for migratory birds included in the terms of the convention between the United States and Great Britain for the protection of migratory birds, concluded August 16, 1916; and (b) to such extent as the Secretary of Agriculture may by regulations prescribe, as a refuge and breeding place for other wild birds, game animals, fur-bearing animals, and for the conservation of wild flowers and aquatic plants; and (c) to such extent as the Secretary of Commerce may by regulations prescribe as a refuge and breeding place for fish and other aquatic animal life.

"Sec. 4. (a) No such area shall be acquired by the Secretary of Agriculture until the Legislature of each State in which is situated any part of the areas to be acquired under this act has consented to the acquisition of such part by the United States for the purposes of this act, and, except in the case of a lease, no payment shall be made by the United States for any such area until title thereto is satisfactory to the Attorney General and is vested in the United States.

"(b) The existence of a right of way, easement, or other reservation or exception in respect of such area shall not be a bar to its acquisition (1) if the Secretary of Agriculture determines that any such reservation or exception will in no manner interfere with the use of the area for the purposes of this act; or (2) if in the deed or other conveyance it is stipulated that any reservation or exception in respect of such area, in favor of the person from whom the United States receives title, shall be subject to regulations prescribed under authority of this act."

Pursuant to the foregoing the Wisconsin Legislature in 1925 passed an act, now section 1.035 of the Wis. Stats. of 1927, reading as follows:

"1.035. *Wild Life and Fish Refuge by United States.* (1) The state of Wisconsin hereby consents that the government of the United States may acquire in this state, in any manner, such areas of land, or of land and water, as the United States may deem necessary for the establishment of the 'Upper Mississippi River Wild Life and Fish Refuge,' in accordance with the act of Congress approved June 7, 1924: Provided, that the states of Illinois, Iowa and Minnesota grant a like consent, and all rights respectively reserved by said states, in addition to the reservation herein made, are hereby reserved to the state of Wisconsin; and provided, further, that any acquisition by the government of the United States of land, or of land and water, shall first be approved by the Governor, on the advice of the conservation commissioner.

"(2) The consent hereby given is upon the condition that the United States shall not, by an act of Congress or by regulation of any department, prevent the state and its agents from going upon the navigable waters within or adjoining any area of land, or land and water, so acquired by the United States, for the purpose of rescuing or obtaining fish therefrom; and the state shall have the right to construct and operate fish hatcheries and fish rescue stations adjacent to the areas so acquired by the United States; and the navigable waters leading into the Mississippi and the carrying places between the same, and the navigable lakes, sloughs and ponds within or adjoining such areas, shall remain common highways for navigation and portaging, and the use thereof, as well to the inhabitants of this state as to the citizens of the United States, shall not be denied.

"(3) The legal title to and the custody and protection of the fish in the navigable waters leading into the Mississippi river and in the navigable lakes, sloughs and ponds within or adjoining such areas in this state, is vested in the state, for the purpose of

regulating the enjoyment, use, disposition and conservation thereof.

"(4) The state retains jurisdiction in and over such areas so far that civil process in all cases, and such criminal process as may issue under the authority of the state against any persons charged with the commission of any offense within or without such areas, may be executed thereon in like manner as if this consent had not been given. (1925, c. 170; 1925, c. 454, s. 1.)"

Approval of the acquisition of the lands in question by the United States has, according to the petition, been accorded by the Governor of Wisconsin, on the advice of the conservation commissioner.

The state's first claim is that this legislative consent is violative of the state Constitution:

First, because La Crosse, Trempeleau, and Vernon counties each has an area less than 900 square miles, and there has been no compliance with section 7, art. 13, of the Wisconsin Constitution. That section reads: "No county with an area of 900 square miles or less shall be divided or have any parts stricken therefrom without submitting the question to a vote of the people of the county, nor unless a majority of all the legal voters of the county voting on the question shall vote for the same."

Second, because the state holds and controls navigable waters in trust for its people, and may not delegate such trust to another sovereignty, and it is under similar nondelegable obligation to its people with respect to game animals, fowl, and fish.

It is not to be denied that the national government may acquire lands necessary or convenient for the exercise of its powers, within any of the states, and that neither the consent of the states nor of individuals is necessary. Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449. And in view of paragraph 2, art. 6, of the federal Constitution, it seems clear that, if we assume power in the government to establish a refuge such as is contemplated here, the states' consent is not necessary, except as it is made so by the act of Congress, and except that exclusive political jurisdiction might not accrue to the government in its absence. Article 1, § 8, par. 17, Const. U. S.; and see Ft. Leavenworth R. R. v. Lowe, 114 U. S. page 531, 5 S. Ct. 995, 29 L. Ed. 264.

However, the "Refuge" Act expressly provides: "No such area shall be acquired by the Secretary of Agriculture until the Legislature of each state * * * has consented * * * to the acquisition * * * for the purposes of this act." Section 4. The consent required is presumably a valid consent, within the constitutional powers of the Legislature. And hence the validity of the consent of the Wisconsin Legislature is a pertinent inquiry.

No authorities have been found by either counsel or myself, construing the Wisconsin constitutional provision above quoted, although it appears that similar provisions exist in the organic law of Colorado, Illinois, Nebraska, Tennessee, Utah, and Washington. It is clear that the taking of the 2,271.29 acres, more or less, involved in this proceeding, from the four counties involved, is not a division of the area of any of the counties. The contention of respondent is that by the condemnation of these lands by the government, with its consequent exemption from taxation, a part of the area of three counties having less than 900 square miles will be "stricken therefrom," within the inhibition of the provision in question. The minutes of the Wisconsin constitutional convention disclose that at least one of the purposes of the provision was to require the people of a county to pass upon the question of dividing a county into more than one, or reducing the area of an existing county, whose original area was less than 900 square miles; they, either as residents of the remaining area, or of the area taken, being the bearers of the increased cost of government occasioned thereby.

Inasmuch as the entire territory of the state has always been subdivided into counties, it is difficult to conceive of any area being stricken from one county, without being added to another, unless the transaction amounted to a division of an existing county into two or more, and I incline to the opinion that the purpose of using the phrase "or have any parts stricken therefrom" was to supplement the prohibition against division, and thus bring within the provision a transaction which amounted to taking a part of a county and adding it to another. So construed, the taking by eminent domain of lands in such a county, whether by the state or nation, for a public purpose, does not amount to either a division, or "striking" from the area, of a county, notwithstanding the area condemned will thereafter be exempt from taxation; this whether the jurisdiction over the land acquired be exclusive or not. If this be not true, the acquisition of post office sites by the United States in any of the three counties, in compliance with sections

1.02 and 1.03 of the Wisconsin Statutes, would be invalid, unless voted by the people of the county.

But it is unnecessary to decide the foregoing proposition, for it is conceded by counsel for the state that the act of the Wisconsin Legislature consenting to the acquisition of lands for the "refuge" grants but concurrent, rather than exclusive, jurisdiction to the United States, over the lands to be acquired. Thus the political sovereignty of the state, including so much thereof as is exercised by the county, remains unimpaired, except in so far as its exercise of the same is incompatible with the jurisdiction of the United States for the purposes of the refuge. Hence it seems quite clear that the area of the counties in question will remain as it has been, and none will be "stricken therefrom."

■ On the second ground alleged as invalidating the consent of the Legislature, the first phase may be disposed of at once, for the reason that it does not appear on the present record that navigable waters are involved; hence no question of unlawful abdication by the state of its obligations to its people in that regard need be considered. Assuming that waters which periodically overflow lands may constitute navigable waters, there is nothing in the petition, or in the act of Congress, or in the act of the Wisconsin Legislature, which indicates that, by the acquisition of the lands in question here, the rights of the people of Wisconsin to use navigable waters will be encroached upon.

■ But it is clear, also, that the right to regulate the taking and use of game and fish is, generally speaking, in the state as an attribute of its sovereignty, subject only to valid exercise of authority under the provisions of the federal Constitution. Geer v. Connecticut, 161 U. S. 519, 16 S. Ct. 600, 40 L. Ed. 793; Ward v. Racehorse, 163 U. S. 504, 16 S. Ct. 1076, 41 L. Ed. 244; Kennedy v. Becker, 241 U. S. 556, 564, 36 S. Ct. 705, 60 L. Ed. 1106; Carey v. South Dakota, 250 U. S. 118, 120, 39 S. Ct. 403, 63 L. Ed. 886.

■ In so far as the "Refuge" Act relates to migratory birds within the terms of the treaty with Great Britain (39 Stat. 1702) and the Migratory Bird Act (40 Stat. 755 [16 USCA § 703 et seq.]), the state's power to consent to the acquisition of land for the purpose of conserving migratory bird life is not open to question. The national government's power to regulate the taking and use of such birds was upheld in Missouri v. Holland, 252 U. S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984, and there can

exist in the state of Wisconsin no trust or obligation to its people requiring it to refuse consent that the national government carry out the latter's constitutional powers. On this branch of the case there remains only the question of the validity of the state's consent relating to game animals, birds (other than migratory), and fish.

In this connection it may be well to note that the "Refuge" Act contemplates no general regulation of the game and fish within the state, but merely that the United States shall acquire and own a limited tract or tracts of land to be used as a refuge and breeding place for such game. Manifestly the purpose is conservation by an approved and effective method, providing a place of limited area where such game may resort, thrive, and multiply, and to that end hunters and fishermen may be excluded under regulations of the Secretaries of Agriculture and Commerce, and prosecuted by the federal authorities in federal courts for violation of such regulations.

The Enabling Act (St. Wis. 1927, § 1.035), however, by paragraph (3) declares that the right of regulating the enjoyment, use, disposition, and conservation of fish in the navigable waters leading into the Mississippi, and in the navigable lakes, sloughs, and ponds within or adjoining such areas in this state, is vested in the state, and by paragraph (2) the state reserves the right, for itself and its agents, to go upon the navigable waters within or adjoining the "refuge" for the purpose of rescuing or obtaining fish therefrom. By paragraph (4) jurisdiction is retained in the state, not only to serve criminal process within the area, but to issue such process against persons charged with offenses within, as well as without, the area. Furthermore the acquisition of lands is required by the law to be approved by the Governor on the advice of the conservation commission. These reservations all indicate that the Wisconsin Legislature deemed the giving of its consent as an aid to the promotion of game conservation for the benefit of its people, and reserved to the state such jurisdiction and rights as were thought necessary to preserve the rights of the public. A long line of cases in the Supreme Court of Wisconsin shows the care with which the rights of the public to hunt and fish, as an incident to the right of navigation, have been preserved. See Willow River Club v. Wade, 100 Wis. 86, 76 N. W. 273, 42 L. R. A. 305; Diana Club v. Husting, 156 Wis. 261, 145 N. W. 816, Ann. Cas. 1915C, 1148; Merwin v. Houghton, 146 Wis. 398,

622

131 N. W. 838; Milwaukee v. State, 193 Wis. 423, 214 N. W. 820.

▮ But, as said before, the question of rights in navigable waters is not involved in the present record. The "Refuge" Act contemplates the acquisition of land, or land and water, subject to overflow. True, the Wisconsin decisions hold that overflow waters may be navigable under certain circumstances, so that the right of the public to hunt and fish thereon during the period of overflow extends with such flowage. However, we are now dealing with the right of the people to hunt and fish without regard to the relation of those rights to navigable waters. It is clear that the state may prescribe closed seasons for hunting and fishing. No reason is perceived why the state might not set off an area of land and forbid hunting and fishing thereon or therefrom as a measure of conservation. In other words, the state might, without doubt, establish such a refuge as is contemplated by the federal act, for all game (with the possible exception of migratory birds). The question here is whether it may consent to the United States doing so. That depends upon just what the United States purposes.

As I view the so-called "Refuge" Act, it establishes primarily a refuge for migratory birds. Congress apparently recognized the fact that, as a necessary and natural result of establishing such a refuge, nonmigratory birds, game generally, and, in so far as the lands were overflowed, fish, would resort thereto and breed therein, so that incidentally the area would become a refuge for many kinds of game. Their increase in the area might or might not become inimical to the welfare of migratory birds. On the other hand, the presence of some varieties of other game and fish, and the conservation of aquatic plants, etc., will undoubtedly be of great value to the area as a refuge for migratory fowl. So it seems quite essential that, as an incident to the maintenance of the refuge for migratory birds, those in charge have some power of regulation over the number and kinds of other game present, and also, in order that the migratory birds may be secure in their refuge, that hunters and fishermen be at times excluded. Thus as an incident to the main purpose arises the necessity of regulation of game which ordinarily is subject to regulation by the state alone. United States v. Shauver (D. C.) 214 F. 154; U. S. v. McCullagh (D. C.) 221 F. 288. This intent of Congress to give to the Secretaries of Agriculture and Commerce the right of regulation of game other than migratory birds, as an incident merely to the main purpose, is clearly and definitely indicated by the phrases "to such extent," as they are used in section 3 of the act.

In Merwin v. Houghton, 146 Wis. 398, 131 N. W. 838, and Milwaukee v. State, 193 Wis. 423, 214 N. W. 820, the doctrine is recognized that the trust in navigable waters imposed in the state for the benefit of its people may be active as well as passive, and that the Legislature may subordinate the rights of hunting, fishing, swimming, and navigation to the greater public need of *better* hunting, fishing, and navigation. And that, as I see it, is after all what the Legislature of Wisconsin consents to in section 1.035 of the Wisconsin Statutes, and I see no invalidity in such action.

What has been said goes far to solve the other questions raised by the challenge of the validity of the "Refuge" Act as beyond the power of Congress. The power of Congress to establish a refuge for game, other than such as is the subject of treaty, may well be seriously doubted. See Missouri v. Holland, U. S. v. Shauver and U. S. v. McCullagh, supra. It may be assumed that it has no such power. Nevertheless it may conserve migratory birds, and do what is reasonably necessary to carry out that power.

▮ It has long been settled that Congress may select the means to carry out a federal function, without interference from the courts. Granting the power to establish a refuge for migratory birds, it follows that it is well within the power of Congress to authorize the Secretary of Agriculture to acquire lands within a state for that purpose, and to authorize the Secretaries of Agriculture and Commerce to make such regulations relating to wild life generally, including nonmigratory game and fish, as becomes reasonably necessary to maintain a proper and efficient migratory bird refuge, and such other regulations as may attend the proprietary ownership of the area by the government, under subsection 2, § 3, art. 4, of the Constitution. Thus viewed, no lack of power in Congress to enact the "Refuge" Act is perceived.

▮ Most of the grounds contended by the state as rendering the Refuge Act unconstitutional have been adverted to in the foregoing discussion. It is further contended that the act improperly delegates legislative power to the Secretary of Agriculture and Secretary of Commerce. However, counsel recognize that this contention has been de-

nied by the United States Supreme Court in United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563.

■ The contention is urged that the "Refuge" Act is unconstitutional because the appropriation of Congress for the purpose of the "refuge" is limited, and because of the proviso: "The Secretary of Agriculture shall not pay for any land or land and water a price which * * * shall exceed an average cost of $10 per acre." Amendatory Act of May 12, 1928 (16 USCA § 729). If this proviso meant that Congress had in advance arbitrarily set a maximum price which could be awarded in condemnation proceedings, and which would be required to be paid before lands could be divested from private owners and vested in the government for the purposes of the act, the question would be very serious indeed. However, in the original act this limit was placed at $5 per acre, and by the amendatory act above referred to the limit was raised to $10 per acre, and there is nothing to prevent Congress from making additional appropriations if that be necessary. I do not regard the proviso as affecting in any manner the award or awards which may be made for the lands taken by eminent domain.

A similar question was involved in Shoemaker v. U. S., 147 U. S. 282, 302, 13 S. Ct. 361, 37 L. Ed. 170; U. S. v. Gettysburg Ry., 160 U. S. 668, 683, 16 S. Ct. 427, 40 L. Ed. 576; and Hanson Lumber Co. v. U. S., 261 U. S. 581, 586, 43 S. Ct. 442, 444 (67 L. Ed. 809). In the latter case it was said:

"The provision authorizing the Secretary to purchase at a cost not to exceed a specified amount has nothing to do with the judicial ascertainment of just compensation for the property condemned. * * * Neither the right of the owner to be put in as good position pecuniarily as he would have been if his property had not been taken, nor the right to have ascertainment and payment of just compensation as a condition of the taking, is attempted to be impaired by legislation here under consideration. It is not necessary that the exact amount required shall be appropriated or that legislation shall indicate no limit upon the expenditure for property to be taken. There is no declaration or evidence of legislative purpose to violate the just compensation clause, or to secure the property in question for less than the full amount to which the owner was entitled. * * * The owner is protected by the rule that title does not pass until compensation has been ascertained and paid, nor a right to the possession until reasonable, certain and adequate provision is made for obtaining just compensation. * * * The authority to condemn is not negatived or affected by the limit set upon cost in the authorization of the Secretary to purchase."

The language quoted above seems fully as applicable to the proviso involved in the instant suit as it was in that involved in the case from which the quotation is made, and the attack upon the constitutionality of the "Refuge" Act upon the ground last stated is, upon the authority of the case last cited, overruled.

■ The last ground of attack which need be specifically dealt with is one in which counsel for the state request this court to take judicial notice that there are school districts in the counties involved within which the lands sought to be condemned are located, and that the commissioner of public lands has loaned state trust funds to these districts, which remain unpaid, and that an irrepealable tax levy has been placed upon the district, which tax, when collected, will repay to the trust funds the loans made on an amortized basis over a period of years. I think it quite doubtful whether the court may take judicial notice of all of the facts necessary to arrive at a final disposition of this point. However, it seems quite clear that, when a school district makes such a loan, and an irrepealable tax is assessed upon an entire district, those facts do not prevent the taking of lands within the district for public purposes. If the conclusion were otherwise, then progress by way of securing lands and making improvements thereon for public purposes, whether for additional schools, for city halls, for fire engine halls, in fact, any one of countless purposes to which lands within a district might be devoted to public purposes, the result of which would exempt lands taken from future taxation, must immediately stop upon the levy of such irrepealable tax.

So far as the owner of other lands in the district are concerned, it is elementary that all private ownership of land is subject to the exercise of eminent domain for public purposes, and this extends, not only to the private owner, whose land may be taken at any time by any such means, but also to other owners of land, whose share of government expense may be incidentally increased by the taking of land from others within the municipal unit for public purposes. What the correct method may be for awarding compensation for lands taken which are subject to such irrepealable tax, whether by ignoring existence of the tax and thus increasing the

amount of such tax upon other lands in the district, or whether the present value of the full amount of the tax payable in a number of annual installments should be ascertained and awarded to the state for the loan, or whether some other method of compensating those interested in the lands should be followed, it is not necessary to determine at this time. It is sufficient for present purposes to hold that the lands must be deemed to be held in private ownership, subject to the right of eminent domain, and, being so held, that taxes imposed upon such land must be held to have been imposed with the understanding that such lands might be taken in eminent domain.

The demurrer of the respondent state of Wisconsin will therefore be overruled.