**In re UNITED STATES (two cases).**
**Nos. 2262, 2275.**

District Court, W. D. New York.
May 19, 1939.

George L. Grobe, U. S. Atty., of Buffalo, N. Y., for petitioner-plaintiff.

John J. Bennett, Jr., Atty. Gen. (Warren H. Gilman, Asst. Atty. Gen., of counsel), for defendants, People of the State of New York.

KNIGHT, District Judge.

Two proceedings have been brought by the United States to acquire by condemnation two several tracts of land situate in the State of New York; one consisting of 1233.82 acres in Allegany County, and the other, 201.363 acres in Schuyler County.

The proceeding first above-mentioned has proceeded to judgment directing condemnation and appointing commissioners of appraisal. To this proceeding the State of New York (hereinafter called State) was a party and defaulted in any appearance, prior to the entry of judgment. Upon the motion to confirm the report of the commissioners the State appeared specially and moved to dismiss the proceedings on four jurisdictional grounds. In the second

above-mentioned proceeding, the State, as a party thereto, on the return date of the petition appeared specially and moved to dismiss on the jurisdictional grounds urged in the first proceeding. The substance of such grounds is that this court is without jurisdiction because of the lack of authority in the United States to condemn the lands in question.

The purpose of acquiring the Allegany County lands, as stated in the petition in the proceeding, is in connection with a program "for the establishment of and for use in connection with the New York Wild Life Management project of the Department of Agriculture." It is also stated that in furtherance of such program it is necessary "to provide the reforestation and forestation of said lands; to prevent soil erosion; to aid in flood control; to prevent forest fires; to provide for the relief of unemployment by the erection and construction thereon and in connection therewith of useful public works including truck trails, bridges, dams, ditches and other public works necessary to said project."

In the Schuyler County petition, the purpose of acquisition is said to be "for the establishment of and for the use in connection with the New York Land Use Reorganization Project of The Department of Agriculture," and it is further stated that "in connection with said project and in furtherance of the objects aforesaid" it is necessary to do and provide the same acts and works set forth in the first-mentioned petition.

Jurisdiction in this District Court of proceedings brought by the United States to condemn land in the district is found in 40 U.S.C.A. § 257. The practice and procedure follows the law of the State of New York. 40 U.S.C.A. § 258. No question is raised as regards the procedure here.

The statute under which the proceedings above-mentioned are brought is the National Industrial Recovery Act of June 16, 1933 (48 Stat. 200). Section 202 of Title 2 of that act, 40 U.S.C.A. § 402, among other things, provides that the Administrator (so designated in the Act) shall "prepare a comprehensive program of public works" which shall include "Conservation and development of natural resources, including control"—of waters, prevention of soil or coastal erosion-flood control—and "Any projects of the character heretofore constructed or carried on either directly by public authority or with public aid to serve the interests of the general public." Section 203 of said Act, 40 U.S.C.A. § 403, states that "With a view to increasing employment quickly * * * the President is authorized * * * through the Administrator, or through such other agencies as he may designate or create, (1) to construct, finance, or aid in the construction or financing of any public-works project included in the program prepared pursuant to section 202 [402] * * * (3) to acquire by purchase, or by the exercise * * * of eminent domain, any real or personal property in connection with the construction of any such project * * *." By subsequent acts the Act of 1933 has been extended to this date and further appropriations made to carry out the purposes of the Act. Through various Executive Orders, by virtue of the authority purported to have been given by law, the President vested in the Secretary of Agriculture the authority "To acquire by purchase, or by exercise * * * of eminent domain, any real or personal property in connection with the construction" of any of the aforementioned projects. No. 6252, 40 U.S.C.A. § 414 note. Pursuant to such purported authority these proceedings are instituted by such official.

Article I, Section 8, Clause 17 of the Constitution of the United States, U.S.C.A., provides for exclusive jurisdiction in the United States over the District of Columbia, and further that the United States shall have such exclusive jurisdiction over "Places purchased by the consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals * * * and other needful Buildings." It is the contention of the State that the sphere of the Federal government in its right of eminent domain is limited by this provision of the Constitution. In its brief it is said that "The right to condemn is limited to 'political necessity' and that limitation is contained in the words of the Federal Constitution, viz.: 'for other needful buildings.' This is the fundamental law which denies an unlimited sphere of eminent domain to the National Government." It has been definitely decided time and again that this provision of the Constitution does not limit the right of acquisition of land by eminent domain by the Federal government. This section applies to lands over which the Federal government seeks exclusive juris-

diction. In the instant cases the government does not seek to obtain exclusive jurisdiction. In Silas Mason Co. v. Tax Commissioner of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187, it was held that the government could acquire land and hold it subject to the state jurisdiction. The authority of the Federal government to acquire land within a state to enable it to perform its proper functions for a necessary or properly authorized purpose is inherent in the sovereignty of the government. This has been recognized by the courts since the decision in Kohl v. United States, 91 U.S. 367, 371, 23 L.Ed. 449. In speaking of such authority that court said: "Such an authority is essential to its independent existence and perpetuity. * * * The right of eminent domain was one of those means well known when the Constitution was adopted. * * * The Constitution itself contains an implied recognition of it beyond what may justly be implied from the express grants. The fifth Amendment contains a provision that private property shall not be taken for public use without just compensation." Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091; Chappell v. United States, 160 U.S. 499, 16 S.Ct. 397, 40 L.Ed. 510; Hanson Lumber Co. v. United States, 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809; Fort Leavenworth R. R. Co. v. Lowe, 114 U.S. 525, 530, 5 S.Ct. 995, 29 L.Ed. 264; Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 656, 10 S.Ct. 965, 34 L. Ed. 295, all lay down the rule hereinbefore stated beyond any ground for doubt. It is pertinent to refer to writers who lay down the same rule. Vide Corpus Juris, Vol. 20, p. 530; Nichols on Eminent Domain, Vol. 1, 2d Ed. p. 108.

It is also the rule that the right of the Federal government to condemn land is dependent upon the condemnation being for a "public purpose," and it must be under an authorization by law. If the statutes in their expression are sufficient to authorize the taking of lands for a "public purpose" and such purpose is declared in the petition which is the basis of these proceedings, then the Federal government is acting within its constitutional rights.

It is obvious that it is not possible to frame a definition of "public use" which is applicable in all cases. "In general it may be said that a public use is one which concerns the general public, or a portion thereof, as distinguished from particular individuals or states * * * use is public if it is a public benefit, utility or advantage." 50 C.J. 864, Public sec. 94. Such use, as it is to be construed in the instant case, must be a use which in effect returns a "public benefit, utility or advantage" "national or general as contradistinguished from local or special" (Kansas City Gas & Electric Co. v. City of Independence, 10 Cir., 79 F.2d 32, 341, 100 A. L.R. 1479)—in other words for the "general welfare."

Article I, sec. 8, of the Constitution, U.S.C.A., was differently construed by Madison and Hamilton, and various other statesmen of their time. Madison asserted that the taxing power given by Section 8, sub. I, for purposes of the common defense or general welfare is limited by each of the succeeding subdivisions of the section; that it does not enlarge the powers of Congress conferred in the other subdivisions. (Madison's Report on the Virginia Resolution; Elliott's Debates.) While Hamilton took the position, followed by Story (5th Ed., secs. 501–505, inc.), and many decisions of the courts, that the phrase "general welfare" is as comprehensive as any that could have been used and embraces "a vast variety of particulars, which are susceptible neither of specification nor of definition" that there is "left to Congress the discretion of the National Legislature to pronounce the object which concerns the general welfare; that the only qualification of the generality of the phrase * * * is that the object * * * be general, and not local; its operation extending in fact and by possibilities throughout the Union, and not be confined to any particular spot." Works of Hamilton (Lodge) Vol. IV, p. 150 et seq. A clearer or more specific definition of the powers and limitation of powers could hardly be conceived. A specific grant of power to tax is given by Section B, sub. I, and by sub. 18 of that section. Congress is authorized to make laws to carry out all of the provisions of the preceding sub-divisions and "all other powers vested by this Constitution in the Government of the United States." "Congress may spend money in aid of the 'general welfare.' * * * The discretion [between particular and general welfare] belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment." Helvering v. Davis,

301 U.S. 619, 57 S.Ct. 904, 908, 81 L.Ed. 1307, 109 A.L.R. 1319.

A presumption is to be strongly indulged in that the statutes are constitutional; that what Congress has declared to be a "public use" is presumptively so. "What makes for the general welfare is necessarily in the first instance a matter of legislative judgment." German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 620, 58 L.Ed. 1011, L.R.A. 1915C, 1189. "When the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation." United States v. Gettysburg, 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576. "Congress has declared the purpose to be a public use, by implication if not by express words. * * * Its decision is entitled to deference until it is shown to involve an impossibility." Old Dominion Land Co. v. United States, 269 U.S. 55, 65, 46 S.Ct. 39, 40, 70 L.Ed. 162; McLean v. Arkansas, 211 U.S. 539, 547, 29 S.Ct. 206, 53 L.Ed. 315; Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307, 109 A.L.R. 1319. Legislative construction should be given great weight by the courts, United States v. Midwest Oil Co., 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed. 673, and mere doubt as to the constitutionality of an act should be resolved in favor of its validity. Legal Tender Case, Knox v. Lee, 79 U.S. 457, 12 Wall. 457, 20 L.Ed. 287; Ogden v. Saunders, 25 U.S. 213, 12 Wheat. 213, 6 L.Ed. 606.

The National Industrial Recovery Act, 40 Stat. 195, as extended by Acts of Congress, is a broad and comprehensive act. Its purpose is indicated by its title. It may be a question whether the carrying out of the single purpose to aid employment is sufficient to sustain authority to condemn lands. United States v. Certain Lands in the City of Louisville, 6 Cir., 78 F.2d 684, appeal dismissed 294 U.S. 735, 55 S.Ct. 548, 79 L.Ed. 1263; Missouri Utilities Co. v. City of California, D.C., 8 F.Supp. 454. Either view does not negative the right of the government to provide needed employment and aid industry in carrying out of projects which come within the meaning of Article I, sec. 8, supra.

Congress by the Act of April 27, 1935, Chap. 85, sec. 1, 49 Stat. 163, 16 U.S.C.A. § 590a et seq., declares its recognition that soil erosion is "a menace to the national welfare," declares its policy to provide for permanent control of soil erosion and sets up various acts to be done to accomplish this result. Since that enactment Congress each year has appropriated large sums of money to aid in carrying out that declared policy. By the Act of June 22, 1936, 33 U.S.C.A. § 701a et seq., Congress first made a declaration of policy that destructive floods were a menace to national welfare. It then authorized the construction of certain public works to prevent flood damage, and since that time has appropriated many millions of dollars for purposes of flood control. By Chapter 503, Laws of 1938, New York appropriated $150,000 to pay its share of the cost of "the state's *participation in the federal flood control* projects."

Section 6 of the Migratory Bird Conservation Act of Feb. 18, 1929, amended by § 301 of Act June 15, 1935, 49 Stat. 378, 381, 16 U.S.C.A. § 715e, provides for the acquisition of lands for migratory bird refuges. Title 5, sec. 501, of the same Act, 16 U.S.C.A. § 715d—3, provides that the President is authorized to allocate moneys appropriated under the Act of April 8, 1935, Emergency Relief Appropriation Act, 49 Stat. 115, "such sum as he may deem *necessary or advisable for the acquisition* by purchase, or otherwise, * * * of areas of land and water * * * for game bird and animal refuges and for migratory bird sanctuaries and refuges, * * *." to be expended in accordance with provisions of Public Resolution No. 11. This resolution is Act of April, 1935, which makes moneys appropriated under it available under the National Industrial Recovery Act of 1933. Further, the Federal government has provided by section 669 et seq., title 16 U.S.C.A., Act of September 2, 1937, Chap. 899, sec. 2, 50 Stat. 917, a nation wide program for wildlife conservation and rehabilitation.

This program for wildlife conservation provides for co-operation between the Federal government and the states. By Chapter 683 of the Laws of New York, of 1938, the State of New York specifically assented to the provisions of the Federal Act for wildlife restoration projects; the conservation Department was directed to co-operate in establishing such projects, and it recognized that such projects "shall be construed to mean and include the selection * * * improvement of areas of land * * * as feeding, resting, or breeding places for wildlife, including acquisition by purchase,

condemnation, lease or gift of such areas." In 1916 a Convention between the United States and Great Britain entered into for the protection of migratory birds recognized the necessity of co-operate action between these countries to meet the danger of extermination through lack of adequate protection. Congress by the Act of June 29, 1937, 50 Stat. 352, 15 U.S.C.A. §§ 609c, 721–728 note, re-allocated funds theretofore appropriated for the extension of further facilities for migratory bird conservation, and Congress also appropriated $1,000,000 to be used for the purposes directed to wildlife restoration and protection. See in re consent of state—United States v. 2,271.29 Acres of Land, etc., D.C., 31 F.2d 617, 618.

By the Act of July 22, 1937, 7 U.S.C.A. § 1000 et seq., Congress set up a program for retirement of sub-marginal lands, lands not suited primarily for cultivation, to "assist in controlling soil erosion, reforestation, preserving natural resources, mitigating floods * * *," etc. This Act, known as the Bankhead-Jones Farm Tenant Act, appropriated not to exceed $10,000,000 for the first fiscal year, $20,000,000 for each succeeding two fiscal years, to carry out the program. The Act purported to authorize the Secretary of Agriculture to acquire such lands "by purchase, gift, or devise, * * *." 7 U.S.C.A. § 1011. Upon the hearings in Congress upon this measure the two projects in question were included in those submitted to the committee in 1938. House Hearing, Agricultural Department Appropriation Bill, p. 1291; Senate Hearing, Agricultural Appropriation Bill, p. 446. Congress acted with the knowledge of the appropriations for these two specific projects.

The record of those hearings discloses that 73,365 acres of land in sixteen counties of New York State, including Allegany and Schuyler, were included in the program of the "Resettlement Administration," an Agency set up by an Executive Order of April 30, 1935, in the Department of Agriculture. The primary purpose of the Resettlement Administration was to acquire sub-marginal lands, unadapted for general farm use, and put these lands to other uses of greater value—such as reforestation, watershed protection, refuges for wild game. It appears from the Congressional Committee record that 8,000,000 to 9,000,000 acres of land had been purchased or acquired for this purpose and that the present program includes 206 projects, in many different states, including altogether 9,072,610 acres of land. It further appears from the record of the Congressional hearing that this program for three contiguous counties, Schuyler, Tioga and Tompkins (among the 16 counties), is to include the acquisition of 27,463 acres of land; that 14,609 acres have already been purchased or acquired; that it is proposed that Cornell College (in New York State) administer 2,325 acres of this land and the New York State Department of Conservation the balance. It further appears that in eleven of the counties (including Allegany) 33,191 acres, of which 6,455 have heretofore been purchased or acquired, constitute one of the projects providing for wildlife conservation and that all of this land is to be administered by the State Conservation Department.

The State of New York by recent Acts, Chap. 503, Laws of 1938; Chap. 525, Laws of 1938; Chap. 683, Laws of 1938; and Appropriation Bill of 1935, has appropriated moneys in aid of the Federal projects for flood control and wildlife preservation and the State thus has recognized that these projects were in aid of proper Federal functions.

Congress has established national forests, 16 U.S.C.A. § 471 et seq. It has adopted numerous acts permitting investigation and study of the effects of soil depletion. It has adopted numerous appropriation acts in aid of forestation and has enacted laws (Act of May 18, 1937, 16 U.S.C.A. § 568b) and other acts for the co-operation by the Federal government with the states in aid of the development of farm forestry.

It is clear that forestation, prevention of soil erosion and flood control have come to be recognized in the mind of Congress as public necessities if we are to conserve our natural resources. Little question could be raised regarding the authority of the state to fulfill any of these programs. Likewise there can be no doubt that forestation, and flood control on even minor streams, and control of soil erosion even over a comparatively small area affect an interest which is "national and general as contradistinguished from local or special." The nature of the program for wildlife-reforestation projects indicates an activity involving a scope much more extensive than a single state. In State of Missouri v. Holland, 252 U.S. 416, 40 S. Ct. 382, 384, 64 L.Ed. 641, 11 A.L.R. 984,

in which the question of the absolute right of the state to deal with question of migratory birds was involved, it was said: "Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. The subject matter is only transitorily within the State and has no permanent habitat therein."

Congress has declared these projects in the public interest, and not only is a presumption to be made in favor of the legality of its acts, but any doubt of validity must be resolved in its favor.

Upon this motion the allegations of fact in the Complaint are deemed to be true. It is alleged that the taking of these lands is "part of a comprehensive plan of public works". It includes allegations descriptive of projects which may clearly be said to be general and not local, and within the public interest and for the public use.

The National Industrial Recovery Act became law when the United States was threatened with widespread disaster due to industrial depression. Since 1929, the average of the unemployed has been at least 10,000,000 persons. The Federal government and the states together have combined to pay, or obligate themselves to pay, each year amounts aggregating billions of dollars to stay the grim hand of want and replenish the fast diminishing flames in the furnaces of industry. No patriotic citizen would question that the "general welfare" has been during these years, and is now threatened. Whether the vast sums appropriated for these purposes aforesaid have effected a permanent good is a question unnecessary to be answered. Whether the moneys expended have been wisely expended need not now be said. Whether there has been any substantial industrial recovery need not be our inquiry here. The fact remains that large sums have been expended in various ways to the relief (temporary at least) of millions of unemployed.

The National Industrial Recovery Act, and amendatory acts, purposed to authorize the extension and expansion of many of the then activities of the Federal government, as well as to provide new ones as necessity might require. The time for thinking that our natural resources are inexhaustible has passed. Today we realize that they are not, and recent years have shown realization of this in large appropriations by the Federal and State governments in aid of re-forestation; flood control; and prevention of soil erosion. There can be no doubt that projects looking to flood control, re-forestation and prevention of soil erosion may in and of themselves affect that "general welfare." As to the establishment of game refuges there can be little doubt under any circumstance. It is quite possible that these projects for re-forestation and conservation and flood control may seem to affect only streams and lands within the particular state; that they are local only. But that seldom so results. Further, the projects are not to be considered separately but as part of the entire program contemplated by the acts. These activities may well be and are in aid of the "general welfare" and hence in the "public interest", irrespective of the demands of the economic interests of the country. Just how far Congress may go in this direction cannot be definitely laid down. "The line must still be drawn between one welfare and another, between particular and general. * * * There is a middle ground or certainly a penumbra in which discretion is at large. * * * The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment. * * * Nor is the concept of the general welfare static. * * * What is critical or urgent changes with the times. * * * Spreading from state to state, unemployment is an ill not particular but general, which may be checked, if Congress so determines, by the resources of the nation. * * *" Helvering v. Davis, supra. Before a statute can be condemned on this ground (invasion of reserved powers of the state) there must be a showing that the things which it authorizes are "weapons of coercion, destroying or impairing the autonomy of the states." Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 890, 81 L.Ed. 1279, 109 A.L.R. 1293. We are aware that the cases from which the court here quotes were cases that did not involve condemnation. If, however, the projects in question are in the interest of the general welfare, the power to tax "in aid of the general welfare" presupposes the power to condemn lands to carry out the projects. Authority to condemn is purported to be given by the National Industrial Recovery Act. "The authority to condemn * * * extends to every case in which an officer of the government is authorized to procure

real estate for public use." Hanson Lumber Co. v. United States, 261 U.S. 581, 43 S.Ct. 442, 444, 67 L.Ed. 809.

Counsel for the State with ability has traced the history of the State relative to the powers reserved to the states in the Confederacy of States, and later under the Federal Constitution. The question here obviously is whether the authority sought to be asserted is within such reserve powers. The answer is found in the decisions of the Supreme Court that "the general government is not dependent upon the caprice of individuals, or the will of state legislatures, in the acquisition of such lands as may be required for the full and effective exercise of its powers." Fort Leavenworth R. R. Co. v. Lowe, 114 U.S. 525, 530, 5 S.Ct. 995, 998, 29 L.Ed. 264, and other cases hereinbefore cited. The projects in question are necessary for the "full and effective exercise" of the powers of the United States.

United States v. Certain Lands in Louisville, supra, is cited by the State to show that these projects are not within the scope of the power of the Federal government. This case, however, is distinguishable from the case at bar in several respects. Decision by divided court was based upon the lack of jurisdiction "for the purpose contemplated." One material difference is that there appeared to be no plan which was being worked out for slum clearances; there was no designation with reference to where the various projects were to be located in order to carry out a plan; and that the President had an illegal delegation of legislative authority; that relief of unemployment as an end in itself is insufficient to authorize the contemplated action. It is true that there is language in the prevailing opinion supporting the contention of the state, but it seems that in this respect such language is not in accordance with the authorities hereinbefore cited.

It has been seen that the question at issue is whether the purpose of appropriation is for a public use. It is easily sensed that the courts have many times passed upon what constitutes a "public use." It is believed that the following cited cases are comparable and sustain the view taken by this court: United States v. Crary, D.C., 1 F.Supp. 406; Missouri Utilities Co. v. City of California, D.C., 8 F.Supp. 454; United States v. 458.95 Acres of Land, D.C., 22 F.Supp. 1017; United States v. 40 Acres, D.C., 24 F.Supp. 390; United States v. 80 Acres, D.C., 26 F.Supp. 315; United States v. 2,271.69 Acres, D.C., 31 F.2d 617; United States v. Threlkeld, 10 Cir., 72 F.2d 464; certiorari denied, 293 U.S. 620, 55 S.Ct. 215, 79 L.Ed. 708; Greenwood County v. Duke Power Co., 4 Cir., 81 F.2d 986; Duke Power Co. v. Greenwood County, 4 Cir., 91 F.2d 665; School Dist. No. 37, Clark Co. v. Isackson, 9 Cir., 92 F.2d 768; Coggeshall v. United States, 4 Cir., 95 F.2d 986; United States v. Dieckmann, 7 Cir., 101 F.2d 421; United States v. Gettysburg Electric Ry. Co., 160 U.S. 668, 680, 16 S.Ct. 427, 40 L.Ed. 576; German Alliance Ins. Co. v. Lewis, 233 U. S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A. 1915C, 1189.

The two proceedings herein were submitted together. The questions involved in each are the same. While the Allegany proceeding had progressed to a judgment without objection by the State, this makes no difference in the status of the two proceedings upon the plea to the jurisdiction.

The motion made by the State upon each of the grounds stated therein in each proceeding is denied.